NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                           :

| | |
|---|---|
| WILFREDO LASSALLE, | :   Hon. Faith S. Hochberg, U.S.D.J. |
| | : |
|            Plaintiff, | :   Civil No. 12-2532 (FSH) (MAH) |
| | : |
|         v. | :   **OPINION** |
| | : |
| PORT AUTHORITY OF NEW YORK & NEW JERSEY, *et al.*, | :   Date: November 19, 2013 |
| | : |
| | : |
|           Defendants. | : |

_____ :

## HOCHBERG, District Judge:

This matter comes before the Court upon the Port Authority of New York & New Jersey's ("the Port Authority" or "Defendant") motion for summary judgment [Dkt. No. 30]. Plaintiff contends that he was discriminated against on the basis of his national origin and race in violation of Title VII, was subject to retaliation in violation of Title VII, that the Port Authority violated the Family Medical Leave Act, was subject to *Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58 (1980) common law retaliation, that Defendant breached an implied covenant of good faith and fair dealing, that Defendant's actions amounted to negligent and intentional infliction of emotional distress, and that Defendant's actions were retaliatory employment practices in violation of N.J.S.A. 34:19-1, *et seq.* The Court has reviewed the submissions of the parties and considered the motion on the papers in accordance with Federal Rule of Civil Procedure 78.

# I.    BACKGROUND[1,2]

On April 27, 2012, Plaintiff filed suit against the Port Authority alleging he was discriminated and retaliated against by his supervisors.  (DS ¶¶ 1, 4; PR ¶¶ 1, 4.)  On January 21, 2013, Plaintiff filed an amended complaint.  (DS ¶ 5; PR ¶ 5.)

The Port Authority was created in 1921 by a compact between New York and New Jersey and consented to by Congress.  N.J.S.A. 32:1-1, *et seq.*; (DS ¶ 3; PR ¶ 3).  The Port Authority hired Plaintiff on November 30, 2009 to work in their Technological Services Department ("TSD").  (DS ¶ 6; PR ¶ 6.)  Plaintiff filed his charge of discrimination with the Equal Employment Opportunity Commission on August 10, 2011.  (DS ¶ 134; PR ¶ 134.)  Plaintiff was terminated on September 24, 2012.  (DS ¶ 200; PR ¶ 200.)

## A.  Plaintiff's Allegations of Discrimination

Plaintiff's allegations of discrimination and retaliation can be categorized into four groups:  (1) the rejection of his internal job applications; (2) his complaints while in Ernest DiFranchi's group; (3) his complaints while in Antonio Pollan's group; and (4) his eventual termination.

---

[1] Unless otherwise noted, these facts come from the parties' statements of undisputed facts.  DS refers to Defendant's statement of undisputed facts, PR refers to Plaintiff's response to Defendant's statement of undisputed facts, PS refers to Plaintiff's statement of undisputed facts, and DR refers to Defendant's response to Plaintiff's statement of undisputed facts.

[2] In response to many of Defendant's Statements of Undisputed Facts, Plaintiff merely stated "cannot agree or disagree."  (PR ¶¶ 35, 51, 64-65, 72, 76, 78, 80-81, 99, 109, 116-117, 122, 126-128, 130-133, 139-142, 148-169, 174, 181, 183-185, 192-193.)  Summary judgment is the time for parties to set forth any evidence they have to show that there is a genuine dispute as to a material fact.  Because Plaintiff failed to set forth any record evidence disputing these points, they are deemed admitted.  Fed. R. Civ. P. 56(c)(1); Fed. R. Civ. P. 56(e); L. Civ. R. 56.1; *see also Travelers Prop. Cas. Co. of Am. v. USA Container Co., Inc.*, Civ. No. 09-1612, 2013 WL 3441409, n.1 (D.N.J. July 8, 2013); *Schwartz v. Hilton Hotels Corp.*, 639 F. Supp. 2d 467, 469 n.2 (D.N.J. 2009).

*i. Plaintiff's Internal Job Applications*

While working for the Port Authority, Plaintiff applied for several internal positions with the organization. On November 29, 2010, Plaintiff applied for a Senior Program Manager position in the Aviation Department and was not selected for an interview. (DS ¶ 55; PR ¶ 55.) On December 22, 2010, Plaintiff applied for the Assistant Director, Asset Management position in the Tunnels, Bridges and Terminals Department and was not selected for an interview. (DS ¶ 58; PR ¶ 58.) On March 11, 2011, Plaintiff applied for the Senior Microsoft Designer position in the Technological Services Department. (DS ¶ 60; PR ¶ 60.) The position was not posted internally, but Plaintiff was allowed to interview for the position. (DS ¶¶ 61, 64; PR ¶ 61.) The Port Authority alleges that Plaintiff subsequently sent an email to human resources withdrawing his application for the position. (DS ¶ 66.) On April 19, 2011, the IT Manager, Customer Service position was posted. (DS ¶ 72.) Plaintiff applied for and did not receive this position. (DS ¶ 73; PR ¶ 73.) Plaintiff does not know why another person was selected for this position, but Plaintiff was sent a memorandum informing him that he was not selected for the position because another candidate appeared to more closely fit the requirements of the particular position. (DS ¶¶ 77, 82; PR ¶¶ 77, 82.) On May 13, 2011, Plaintiff applied for the Senior Financial Manager, World Trade Center Construction position and was not selected for an interview. (DS ¶ 83; PR ¶ 83.) Plaintiff agrees that he does not have a degree in finance or accounting, does not have a background in construction coordination or reviewing construction projects or proposals, and has never held a senior financial management position. (DS ¶¶ 85-87; PR ¶¶ 85-87.) On June 8, 2011, Plaintiff applied for the Manager, Lincoln Tunnel Operations position in the Tunnel, Bridges, and Terminals Department and was not selected for an interview. (DS ¶ 88; PR ¶ 88.) This job's responsibilities include traffic management, incident

detection, response, mitigation, and construction coordination. (DS ¶ 89; PR ¶ 89.) Plaintiff agrees that he has no experience working at a tunnel and no background in traffic management, emergency response, or construction coordination. (DS ¶ 90; PR ¶ 90.) On December 16, 2011, Plaintiff applied for the Senior IT Project Manager position opening in the Technological Services Department but was not selected for this position. (DS ¶¶ 91, 96; PR ¶ 91.) Plaintiff would not have received a salary increase if he had received this position. (DS ¶ 94; PR ¶ 94.)

Defendant contends that Plaintiff did not meet the minimum job requirements these positions or that there were other candidates that were a better fit for the positions. (DS ¶¶ 56-57, 59, 65, 71, 73-82, 84-87, 89-90, 96-97.)

### ii. The DiFranchi Group Complaints

On April 21, 2010, Plaintiff claims that his supervisor, Mr. DiFranchi, cut him off, yelled at him, cursed at him, berated him, and belittled him over dusty equipment, and then turned the light off on him an another co-worker. (DS ¶ 16; PR ¶ 16.) On April 30, 2010, Plaintiff met with Mr. Turner and Stephanie Lewis-Desire, the Port Authority's head of EEO compliance, Diversity, and Inclusion ("EEO"), and filled out an internal EEO complaint with the Port Authority. (DS ¶ 17; PR ¶ 17.) On September 8, 2010, Plaintiff complained about "Ernies [*sic*] hostile/abusive/unprofessional treatment of me and others." (DS ¶ 31; PR ¶ 31.) Plaintiff testified that it was "correct" that Mr. DiFranchi's allegedly abusive, bullying management style was directed toward staff members in general and that his behavior was not limited to Plaintiff. (DS ¶ 33; PR ¶ 33.) The Complaint states that "all [Plaintiff] wanted was the harassment to stop and that he would wait for the Technical [*sic*] Services Department reorganization coming up or the open positions from the retirees to move into a different role in hopes that the harassment would stop." (DS ¶ 52; PR ¶ 52.)

On April 27, 2011, the Technological Services Department was reorganized. (DS ¶ 98; PR ¶ 98.) The Port Authority alleges that the reorganization was intended to align skills with new or revised functions—it was not about giving or taking away roles that the staff performed. (DS ¶ 99.) As a result, Plaintiff moved into a different group in the organization. (DS ¶ 100.) Plaintiff testified he was happy to be out of Mr. DiFranchi's group. (DS ¶ 104; PR ¶ 104.) Plaintiff also testified he had the same title and did not have a salary reduction after the reorganization. (DS ¶ 105; PR ¶ 105.) Plaintiff's new direct supervisor was Atul Damani, who reported to Assistant Director Antonio Pollan. (DS ¶ 108; PR ¶ 108.) On October 13, 2011, Plaintiff wrote an email to his supervisors complaining of retaliation and racial discrimination. (DS ¶ 111; PR ¶ 111.) Plaintiff testified that Mr. Pollan retaliated against him by having him sign in and out of work, belittling him on a whiteboard exercise, cursing at him, asking him to attend a meeting on Christmas Day, and transferring Plaintiff out of his group. (DS ¶ 118; PR ¶ 118.) Plaintiff agrees that Mr. Pollan made everyone in his group sign in and sign out of work. (DS ¶ 119; PR ¶ 119.) On January 12, 2012, Plaintiff tape-recorded a meeting that he had with Mr. Pollan and alleged that Mr. Pollan's discussion concerning the length and frequency of his breaks continued to create a hostile work environment and was in retaliation for his previous complaints. (DS ¶ 135; PR ¶ 135.)

In January 2012, Plaintiff was transferred to Lisa Cratty's group within the Technological Services Department. (DS ¶ 136; PR ¶ 136.) Plaintiff testified that he asked to be transferred out of Mr. Pollan's group and that he was happy to be transferred. (DS ¶ 137; PR ¶ 137.)

### B. Plaintiff's Purchase of Dameware

On March 20, 2012, Plaintiff signed a purchase order on behalf of his supervisor, Ms. Cratty, to purchase "Dameware." (DS ¶ 138; PR ¶ 138.) Defendant alleges that Dameware is a dangerous piece of software that allows a user to view and record a target computer's files and activity from an off-site location possibly without being detected. (DS ¶ 144.) Defendant also alleges that Dameware was not approved software for use on Port Authority computers, that Plaintiff did not follow proper procedure with regard to getting approval for the purchase of the software, and that he was not authorized to buy Dameware or sign on Ms. Cratty's behalf. (DS ¶¶ 145-147.) On July 5, 2012, Ms. Cratty became aware that Mr. Damani's computer might have been accessed in an unauthorized manner. (DS ¶ 139.) Ms. Cratty and others within the Technological Services Department began looking at potential software applications that might have made remote access to Mr. Damani's computer possible. (DS ¶ 140.) On July 9, 2012, Mr. Pollan contacted the Office of the Inspector General of the Port Authority ("OIG") to report that Plaintiff signed a purchase order for Dameware on behalf of Ms. Cratty without authorization. (DS ¶ 141.) On July 16, 2012, the OIG interviewed Germania Urena, an individual who sells software to the Port Authority. (DS ¶ 149.) Ms. Urena told the OIG that Plaintiff asked her to obtain a quote to purchase Dameware and that Ms. Cratty had authorized him to sign for her on purchases less than $500. (DS ¶ 150-151.) Ms. Urena said that Plaintiff told her not to tell anyone he was getting a copy of Dameware because he did not want anyone to know he had it. (DS ¶ 152.) Ms. Urena believed that Dameware was not approved for use by the Port Authority. (DS ¶ 153.) Mr. Urena also told the OIG that Plaintiff told her that he had "hacked into systems at prior jobs." (DS ¶ 155.)

It is undisputed that Ms. Cratty told the OIG that: (1) Plaintiff did not have authorization to sign on her behalf to purchase Dameware; (2) Plaintiff should have known that he was not authorized to sign any purchase orders since at least April or June 2011 and that this was a well-known and universally applied policy in the Technological Services Department; (3) Plaintiff was supposed to use Zenworks, another remote access software that was authorized by the Port Authority for remote access; (4) Zenworks requires the end-user to approve a remote login attempt and permits them to supervise what the remote user is doing; (5) Dameware is not an approved software application for use within the Port Authority;[3] and (6) Dameware is particularly powerful because it allows a remote-user to control a third-party computer without the third-party's notice or consent. (DS ¶¶ 162-166, 175; PR ¶ 175.)

On July 27, 2012, Plaintiff was interviewed by the OIG. (DS ¶ 170; PR ¶ 170.) Plaintiff told the OIG that he had installed Dameware on his Port Authority computer. (DS ¶ 171; PR ¶ 171.) Plaintiff alleges that Ms. Cratty gave him permission to purchase software and that Dameware is software authorized by the Port Authority. (PS ¶¶ 64.1, 64.2.) Specifically, Plaintiff testified that he did not follow the process for getting approval for non-approved software because Dameware is part of "Solarwinds," a Port Authority approved software suite of network applications. (DS ¶ 177; PR ¶ 177.) Yet, at the time of the investigation, Plaintiff acknowledged to the OIG that he did not follow the appropriate procedure for requesting to use non-approved software with respect to Dameware and that, in hindsight, he should have followed the appropriate procedures.[4] (DS ¶ 172.) Plaintiff also told the OIG that he knew Dameware

_____

[3] Ms. Carol Maresca, Deputy Director of TSD, also testified that Dameware is not approved software even if it is part of the Solarwinds suite of products. (DS ¶ 179; PR ¶ 179.)

[4] In response to this statement in Defendant's Statement of Undisputed Material Facts, Plaintiff wrote: "Cannot agree with the characterization from the point that he had followed this procedure in the past." (PR ¶ 172.) Plaintiff's response failed to cite any record evidence or

was not approved for use on Port Authority computers.[5]  (DS ¶ 173.)  Plaintiff told the OIG that he did not ask Ms. Cratty for authorization to purchase Dameware, even though he told Ms. Urena that he had such authorization.  (DS ¶ 174.)  On July 30, 2012, after his interview with the OIG, Plaintiff sent an email alleging continued retaliation.  (DS ¶ 180; PR ¶ 180.)  On August 1, 2012, Plaintiff went out sick.  (DS ¶ 182; PR ¶ 182.)

The OIG concluded that Plaintiff had improperly authorized the purchase of software not approved for use on Port Authority computers.  (DS ¶¶ 183-184; PR ¶¶ 183-184.)  Further, the OIG found that he did so by signing a purchase order on behalf of his supervisor without authorization and lied to Ms. Urena to cause the purchase to proceed.  (*Id*.)  On August 7, 2012, Plaintiff was suspended without pay based on the OIG report.  (DS ¶¶ 186-88; PR ¶¶ 186-88.)  On August 15, 2012, the Port Authority created a memorandum recommending that Plaintiff be terminated based on, *inter alia*, the OIG report.  (DS ¶¶ 192-93.)  Plaintiff requested a hearing to contest his removal.  (DS ¶ 194; PR ¶ 194.)  Plaintiff attended the hearing with counsel, did not speak at the hearing, and submitted a written statement shortly thereafter.  (DS ¶¶ 194-95; PR ¶¶ 194-95.)  Plaintiff was terminated on September 24, 2012.  (DS ¶ 200; PR ¶ 200.)  On November 9, 2012, after receiving Plaintiff's written statement, the hearing officer issued a memorandum.  (DS ¶ 196; PR ¶ 196.)  The hearing officer noted that Plaintiff did not deny, at the hearing or in his written statement, that he undertook to obtain and install the Dameware software, which the OIG concluded was unauthorized software, on the Port Authority's computer system.  (*Id*.)  The hearing officer also found that Plaintiff acknowledged to the OIG that he did not have

---

affidavit and failed to address the substance of Defendant's statement.  The Court deems this fact admitted.

[5] Plaintiff's response to this Statement of Undisputed Material Fact is similarly deficient. Plaintiff's response disagrees with the fact, but it fails to cite any record evidence or affidavit. (PR ¶ 173.)  This fact is deemed admitted as well.

authorization and did not follow the proper procedures, he never advised his supervisors that he purchased Dameware, he never vetted the issue of replacing Zenworks with Dameware with his supervisors, and he never told the OIG that Dameware was approved software.  (DS ¶ 197; PR ¶ 197.)  The hearing officer found management's lack of confidence in Plaintiff warranted and that the misconduct supported the recommendation that Plaintiff be terminated.  (DS ¶¶ 198-199; PR ¶¶ 198-199.)

## II.     STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994).  The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249.  "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict."  *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir. 1990).

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323.  This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden.  *Id.*, at 322-23.  Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a "genuine issue of material fact" justifying trial.  *Miller*, 843 F.2d at 143; *accord Celotex Corp.*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.*, at 587 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative."  *Anderson*, 477 U.S. at 249-50.

## III.    DISCUSSION

### A.  Plaintiff's Title VII Retaliation Claim

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or

because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3.

In a Title VII retaliation case, a plaintiff can show retaliation through either direct or circumstantial evidence. *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005). When a plaintiff presents circumstantial evidence, as opposed to direct evidence, in support of his or her claim, "the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)" governs. *White v. Planned Security Services*, 480 F. App'x 115, 118 (3d Cir. 2012). The parties agree that this is the correct test to apply in this case. (Def.'s Br. at 11; Pl.'s Br. at 40.) Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case for unlawful retaliation by demonstrating that (1) he engaged in an activity protected by Title VII; (2) the defendants took an adverse employment action against him;[6] and (3) there was a causal connection between his participation in the protected activity and the adverse employment action he suffered. *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995); *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). If the plaintiff establishes a *prima facie* case of unlawful retaliation, the burden then shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the adverse employment action. *Moore*, 461 F.3d at 342. Finally, if the defendant establishes a legitimate reason for the adverse employment action, then the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's explanation is false and that retaliation was the real reason for the adverse employment action.[7]

_____

[6] "[A] plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions materially adverse in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (internal quotation marks omitted).

[7] A plaintiff may show pretext by submitting evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of

*Id.*; *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (explaining that plaintiff must show that "retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process." (internal quotations omitted)).

### i. The Port Authority's Legitimate Non-Retaliatory Reasons for Its Actions

Plaintiff's alleged adverse employment actions related to retaliation generally fall into four categories[8]: jobs at the Port Authority that Plaintiff applied for and did not receive; Plaintiff's new position after a reorganization at the Port Authority; the Port Authority's investigation and eventual termination of Plaintiff related to the Dameware software; and various complaints while in Mr. Pollan's group.[9] The Court addresses the first three categories together

---

the employer's action." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). Under the first prong, the party must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence." *Id.*, at 1108-09. Prong two has recently been modified by the Supreme Court. Plaintiff must now show that "but for" Defendant's retaliatory bias, he would not have experienced the adverse employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Coleman v. Jason Pharm.*, Civ. No. 12-11107, 2013 WL 5203559, *1 (5th Cir. Sept. 17, 2013).

[8] Plaintiff listed 25 adverse employment actions for his retaliation claim. (Pl.'s Br. at 41-45.)

[9] Plaintiff's brief merely cites to "Defendant's Exhibit A" for many of these allegations. "Defendant's Exhibit A" is a copy of Plaintiff's amended complaint. Merely relying on unsupported allegation in a complaint is not enough to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court could reject Plaintiff's allegations on this ground alone. For the remaining allegations listed, Plaintiff merely cites to "Statement of Facts" or "Defendant's Statement of Facts" without a single paragraph number. This too is insufficient to survive summary judgment as it fails to identify facts in the record that support Plaintiff's allegations. *See* Fed. R. Civ. P. 56(c); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.").

as the Port Authority argues it had legitimate non-retaliatory reasons for its actions. The alleged harassment in Mr. Pollan's group is addressed separately below.

1. Plaintiff's Job Applications

The Port Authority argues that for every job the Plaintiff applied for, he either was not qualified for the job, or there were other more qualified individuals for the position. With respect to many of the positions, Plaintiff asserts that:

> [H]e applied for jobs that he was qualified for and/or had the aptitude to learn the job. Many positions including those of political patronage are filled by people that can perform the job duties and learn the functions. TSD is full of employees without degrees let along degrees in IT who are performing job duties. For Example [*sic*], Carol Maresca the Assistant Director for the Technical [*sic*] Services Department has no IT experience, worked for years in Public Safety and has no degree in IT/Computer Science.

(PR ¶ 56; *see also id.*, at ¶¶ 57, 59, 62, 65, 84-87, 90.) This portion of Plaintiff's 56.1 statement does not contain any citations to the record or to affidavits. As such, the Court will treat these Responses to Statements of Undisputed Material Facts by Defendant as admitted. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"); Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion"); L. Civ. R. 56.1 ("The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed

shall be deemed undisputed for purposes of the summary judgment motion."); *see also Hyland v. Am. Gen. Life Companies, LLC*, Civ. No. 06-6155, 2008 WL 4308219, n.1 (D.N.J. Sept. 17, 2008), *aff'd sub nom. Hyland v. Am. Int'l Grp.*, 360 F. App'x 365 (3d Cir. 2010); *Gurvey v. Fixzit Nat. Install Servs., Inc.*, Civ. No. 06-1779, 2011 WL 1098994, *3 (D.N.J. Mar. 21, 2011) ("Absent evidence, a fact is not disputed simply because Plaintiffs deny it in their papers."). In any event, the fact that Ms. Maresca may be in a particular position without a degree in IT or computer science has no bearing on whether the positions Plaintiff applied for have certain job requirements or if there was another applicant more qualified for the position.

It is undisputed that the Senior Program Manager position in the Aviation Department required a degree in engineering and that Plaintiff does not have a degree in engineering. (DS ¶¶ 56-57.) It is undisputed that at the time Plaintiff applied for the Assistant Director, Asset Management for Tunnels, Bridges, and Terminals he did not have any asset management experience in complex transportation-related infrastructure and technology projects, had no experience in construction, and had no knowledge of capital planning. (DS ¶ 59.) It is undisputed that the Senior Financial Manager, Word Trade Center Construction position required a bachelor's degree in accounting, finance, or a related discipline. (DS ¶ 84.) It is undisputed that Plaintiff does not have a degree in finance or accounting, has no background in construction coordination, no background in reviewing construction proposals or projects, and has never held a senior financial management position. (DS ¶¶ 85-87; PR ¶¶ 85-87.) It is undisputed that the Manager, Lincoln Tunnel Operations, Tunnels, Bridges, and Terminals position's responsibilities included traffic management, incident detection, response, mitigation, and construction coordination. (DS ¶ 89; PR ¶ 89.) It is also undisputed that Plaintiff has no experience working

in a tunnel and has no background in traffic management, emergency response, or construction coordination. (DS ¶ 90; PR ¶ 90.)

For each of these positions, the Port Authority has provided a legitimate non-retaliatory reason for its actions. Specifically, the Port Authority has provided evidence that each of the above positions required skills, experience, or education that the Plaintiff did not possess. The Plaintiff has not come forward with any evidence that the Port Authority's explanation is false and that retaliation was the real reason for the adverse employment action. There are no genuine issues as to any material fact with respect to these allegedly retaliatory employment actions. No reasonable juror could find "facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli*, 916 F.2d at 860. The fact that Plaintiff did not receive these positions does not support his claim for retaliation under Title VII.

In addition to the non-retaliatory reasons given by the Port Authority, Plaintiff's allegations related to his application to the Aviation Department on November 29, 2010 and the Tunnels, Bridges, and Terminals Department on December 22, 2010 cannot be considered because they are time barred. A plaintiff must file an EEOC charge within 180 days of the alleged discriminatory act. *See Dezaio v. Port Auth. of NY & NJ*, 205 F.3d 62, 66 (2d Cir. 2000); *see also Noel v. The Boeing Co.*, 622 F.3d 266, 270 (3d Cir. 2010) ("If a claimant fails to exhaust his or her claim within the requisite time period, that claim is administratively barred. This statute of limitations applies to discrete employment actions, including promotion decisions."). These actions occurred more than 180-days before the filing of Plaintiff's EEOC charge and are, therefore, time barred. For this separate and independent reason, they cannot be the basis for Plaintiff's claims under Title VII.

Plaintiff also applied for three positions that the Port Authority alleges went to more qualified individuals. Those positions included Senior Microsoft Designer, IT Manager Customer Services, and Senior IT Project Manager.

With respect to the Senior Microsoft Designer position, the Port Authority makes two arguments: (1) Plaintiff withdrew his name from consideration for the position, and (2) a more qualified person was hired for the position. In response, Plaintiff argues that he was told by Mr. Damani and Mr. Pollan "to back out of the position since it would be lateral and there would be no raise, plus they wanted Mr. Lassalle because of Mr. Lassalle's background to be part of the hiring committee."[10] (PR ¶ 66; *see also id.*, ¶¶ 67-70.) But Plaintiff does not dispute that "[t]he technical qualification of other candidates for this position were stronger and they had more hands-on experience with the Microsoft software components." (DS ¶ 65.) Indeed, there is no genuine dispute that Plaintiff recommended the person who eventually filled this very position. (DS ¶ 65; *see also* Brophy Cert., Ex. J (Lassalle Dep. Tr. at 180 ("Q: Did you recommend Mr. Lobl for this position? A: Yes.")).) It is also unrebutted that Plaintiff was allowed to interview for this position, not due to his resume qualifications, but as a professional courtesy. (DS ¶ 64.) The Port Authority has met its burden to show it had a legitimate non-retaliatory reason for its actions.

In response, Plaintiff argues that Mr. Lobl did not have better qualifications or experience than Plaintiff. (PS ¶ 71.) In support of this proposition, Plaintiff cites to his own deposition.[11] (*Id.*, citing Lassalle Dep. Tr. at 178-184; 187.) But this statement does not change the fact that

---

[10] There is no genuine dispute that Plaintiff did indeed withdraw his name from consideration. (*See* Brophy Cert., Ex. J (Lassalle Dep. Tr. at 173 ("Q: You withdrew from the Senior Microsoft Designer position, correct? A: Yes, I withdrew because I was advised by management at the time. Q: You withdrew, correct? A: Yes.")).)

[11] The Court notes that the citation provided by Plaintiff fails to fully factually support this proposition.

Plaintiff did not dispute that the technical qualifications of other candidates were stronger and that he even recommended Mr. Lobl for the position. There is no genuine dispute as to any material fact that the Port Authority provided a legitimate non-retaliatory reason for hiring Mr. Lobl. No reasonable juror could find "facts that demonstrated, by a preponderance of the evidence, that the [Plaintiff] is entitled to a verdict." *In re Paoli*, 916 F.2d at 860.[12]

Plaintiff also applied for and did not receive the IT Manager, Customer Services position in the Technological Services Department. Tom Momyer eventually was selected for this position. (DS ¶ 73; PR ¶ 73.) Mr. Momyer received an "exceptional" overall performance rating in the year prior to being hired into the IT Manager position. (DS ¶¶ 78.) In addition, Mr. Momyer had extensive experience in IT management. (Dkt. No. 30-30, Exhibit AA.) Lisa Cratty, one of the individuals who conducted the interviews for the position, stated that "Tom [Momyer] has greater experience in the Enterprise Application environment, business analysis, customer service and Port Authority authorization and RFP policies." (DS ¶ 81.) On July 20, 2011, Plaintiff was notified that he was not selected for the position and "that another candidate appeared to more closely fit the requirements of this particular position." (DS ¶ 82; PR ¶ 82.) The Port Authority has met its burden to show it had a legitimate non-retaliatory reason for its actions. In response, Plaintiff cites to Paragraph 71 of his response to Defendant's Statement of Undisputed Facts. But Paragraph 71 of Plaintiff's Response to Defendant's Statement of Undisputed Facts merely states that Mr. Lobl, a person at the Port Authority totally unrelated to this position, did not hold better qualifications or have more experience than Plaintiff. (PR ¶¶

---

[12] In addition, more than nine months had passed between Plaintiff's alleged protected activity and the alleged retaliatory conduct. (Pl.'s Br. at 41.) Without more, this passage of time cannot create an inference of causation. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.").

71, 79.) This fails to create a genuine dispute as to any material fact with respect to the Port Authority's proffered evidence showing a legitimate non-retaliatory reason for its actions in hiring Mr. Momyer for this position.

Plaintiff also applied for the Senior IT Project Management position within the Technological Services Department. Defendant argues that Sunita Lally was selected for this position over six other candidates based on her interview performance and the depth of her project management experience. (DS ¶ 96.) The Port Authority has met its burden to show it had a legitimate non-retaliatory reason for its actions. In response, Plaintiff again cites to Paragraph 71 of his response to Defendant's Statement of Undisputed Facts. But as noted above, Paragraph 71 of Plaintiff's Response to Defendant's Statement of Undisputed Facts relates to Mr. Lobl, a person at the Port Authority totally unrelated to this position. (PR ¶¶ 71, 96-97.) This fails to create a genuine dispute as to any material fact with respect to the Port Authority's proffered evidence showing a legitimate non-retaliatory reason for its actions in hiring Ms. Lally for this position.

In short, based on the undisputed facts in this matter, none of the above hiring actions may serve as the basis for Plaintiff's Title VII retaliation claim.

### 2. The Port Authority's Reorganization

Plaintiff also alleges retaliation based on events surrounding the Port Authority's reorganization. Specifically, Plaintiff alleges that on April 27, 2011, he was moved from Mr. DiFranchi's group to Mr. Pollan's Enterprise Architecture group and reported to Atul Damani, a non-assistant director. (PS ¶ 19.) Plaintiff previously reported to an assistant director level manager and was the only former direct employee of Mr. DiFranchi that did not continue to report to an assistant director. (*Id.*) Plaintiff also alleges that he was stripped of all of his direct-

report personnel, contracts, and management functions. (*Id.*) In response, Defendant alleges that it had legitimate, non-retaliatory reasons for transferring Plaintiff. It is undisputed that the purpose of the reorganization was to align skills with new or revised functions, not about giving or taking away roles that staff performed. (DS ¶ 99.) Plaintiff has failed to rebut this legitimate, non-retaliatory reason for transferring Plaintiff.[13] Therefore, Plaintiff cannot support his Title VII retaliation claim on the basis of his new position due to the Port Authority's reorganization. *See Fichter v. AMG Res. Corp.*, Civ. No. 12-3302, 2013 WL 2501968, *4 (3d Cir. June 12, 2013) ("The managerial function of allocating resources is a common business decision, and [Plaintiff] provides no evidence from which to conclude that [her manager] was motivated by discriminatory animus.")

Plaintiff has also failed to show the but-for causation element of his *prima facie* case. Plaintiff has failed to provide evidence linking this alleged adverse employment action to the protected activity. Indeed, almost a year passed between the last alleged protected activity (May 28, 2010) and the Port Authority reorganization (April 27, 2011). (Pl.'s Br. at 41.) "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon*, 503 F.3d at 233. For this separate and independent reason, Plaintiff's transfer cannot support his Title VII retaliation claim.

### 3. The OIG Investigation and Plaintiff's Termination

Plaintiff also argues that the OIG investigation and his eventual firing were forms of retaliation. In response, Defendant argues that it had a legitimate, non-retaliatory reason for

---

[13] It is notable that Plaintiff was happy to be out of Mr. DiFranchi's group and retained is prior title and salary. (DS ¶¶ 104-105; PR ¶¶ 104-105.)

investigating and terminating Plaintiff. Defendant argues that Plaintiff purchased and installed the Dameware software without authorization using Port Authority funds. In response, Plaintiff argues that he was authorized to purchase the Dameware software because (1) Ms. Cratty authorized him to purchase software, and (2) Solarwinds is approved software and Dameware is a part of that software suite.

When faced with a legitimate, non-retaliatory reason for Defendant's actions, the burden of proof rests with Plaintiff to show that the proffered reasons are pretextual. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 455 (3d Cir. 2006). "The plaintiff may . . . survive summary judgment or judgment as a matter of law by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[14] *Keller*, 130 F.3d at 1108. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). "[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Keller*, 130 F.3d at 1109 (citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)). Plaintiff "must show, not merely that [Defendant's] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Fichter*, 2013 WL 2501968 at *4.

---

[14] For a retaliation claim, retaliation must be the "but-for cause" not a motivating cause for the employer's action. *Nassar*, 133 S. Ct. at 2534.

Plaintiff admitted to the OIG that he was not authorized to purchase and install Dameware. Indeed, he went so far as to admit that, in hindsight, he should not have purchased the software at all. Even assuming, without deciding, that Plaintiff is correct that he was *actually* authorized to purchase the software, it would not save his retaliation claim given the undisputed facts. Plaintiff admitted to the OIG that he was not authorized to purchase Dameware and failed to follow the correct procedures. Based on this information and the rest of its investigation, the OIG concluded that Plaintiff improperly authorized the purchase of unauthorized software. Based on the OIG report, the Port Authority suspended and eventually terminated Plaintiff. There is no evidence in the record that its findings were a pretext. Plaintiff has failed to show that his resulting termination was for any reason other than the OIG's finding. Plaintiff has no right to a "correct" decision by the OIG and the Port Authority. He only has the right to a decision that is not motivated by discrimination or retaliation. *Keller*, 130 F.3d at 1109.

Plaintiff has failed to point to any evidence that demonstrated weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the Port Authority's reasons for its employment decisions. A reasonable jury could not find that retaliation was the but-for cause of Plaintiff's termination.[15]

Even if Plaintiff were to overcome the Port Authority's legitimate, non-retaliatory reason for terminating him, Plaintiff's claim would fail for lack of showing the causation element of his *prima facie* retaliation claim. Plaintiff's last alleged protected activity prior to his termination was his April 27, 2012 Complaint. Plaintiff's next alleged retaliation action was his July 27,

---

[15] Plaintiff argues that the fact that the State of New Jersey's Department of Workforce Development awarded him benefits, noting they did not find an intentional violation of any company rule or wanton disregard of policy, supports his argument that he was authorized to purchase Dameware. As noted above, whether or not Plaintiff was actually authorized to purchase Dameware is not dispositive. In any event, an administrative agency finding is not preclusive in Title VII proceedings. *Roth v. Koppers Indus., Inc.*, 993 F.2d 1058, 1063 (3d Cir. 1993).

2012 interview by the OIG. (Pl.'s Br. at 45.) A time gap of three months between the alleged protected activity and the adverse action, without more, cannot create an inference of causation to defeat summary judgment. *LeBoon*, 503 F.3d at 233.

### ii. Mr. Pollan's Group

Plaintiff argues that he experienced retaliation after his transfer to Mr. Pollan's group.[16] Specifically, Plaintiff argues that the following activity amounted to retaliatory adverse employment actions: he was required to sign in and out of work; he was "micro managed" by Mr. Pollan and that Mr. Pollan used a tone that was condescending and belittling; during one meeting, Mr. Pollan cursed at Plaintiff using the word "bullshit" at least three times; Plaintiff alleges that he was stripped of all but one of his projects; he received meeting invitations from Mr. Pollan for a daily activity update in the morning and afternoon; he never received a two-year evaluation; Mr. Pollan is alleged to have attempted to have Plaintiff attend a meeting on Christmas day, and, after Plaintiff declined the meeting, Mr. Pollan is alleged to have "loudly" asked why the meeting was declined; on December 27, 2011, Mr. Pollan is alleged to have embarrassed Plaintiff using a belittling white board exercise; Mr. Pollan is alleged to have accused Plaintiff of stealing time; Plaintiff was told that he would have to notify Mr. Pollan and Mr. Damani when he took a break longer than 15 minutes; on January 12, 2012, Mr. Pollan accused Plaintiff of taking extended breaks; on January 13, 2012, Plaintiff alleges that Mr. Pollan cursed at him, called him a liar, and sent him home. (Pl.'s Br. at 42-45.) Defendant argues that these alleged micromanagement and work criticisms do not qualify as materially adverse actions as a matter of law.

---

[16] Plaintiff agrees that Mr. Damani and Mr. Pollan did not harass him based on his race or national origin. (Brophy Cert., Exhibit J (Lassalle Dep. Tr. at 218).)

"In evaluating whether actions are materially adverse, we must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Moore*, 461 F.3d at 346 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Title VII . . . does not set forth a general civility code for the American workplace." *Burlington*, 548 U.S. at 68 (internal quotation marks omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

Courts have routinely rejected claims based on these types of micromanagement or work criticisms. *See, e.g.*, *Atkinson v. N. Jersey Developmental*, 453 F. App'x 262, 266 (3d Cir. 2011) (affirming summary judgment of no retaliation and no discrimination under Title VII noting that the plaintiff failed to show an adverse employment action when plaintiff alleged, *inter alia*, micromanagement); *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 428 (D.N.J. 2009) (finding that intensified supervision, micromanagement, and being "harassed" about time and attendance matters did not rise to material adversity); *DeLuzio v. Family Guidance Ctr. of Warren Cnty.*, Civ. No. 06-6220, 2010 WL 1379766, *14 (D.N.J. Mar. 30, 2010) ("[A]t worst, [the supervisor's] actions constituted 'increased scrutiny' and 'micromanaging' of Plaintiff's work—which are not actionable."); *Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) (finding that "being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII" and collecting cases); *Sparrock v. NYP Holdings, Inc.*, Civ. No. 06-1776, 2008 WL 744733, *3 (S.D.N.Y. Mar. 4, 2008) (noting that the "micromanaging" incidents at issue were merely "minor irritants of everyday life and business"); *Castro v. New York City Bd. of Educ. Pers.*, Civ. No. 96-6314, 1998 WL 108004, *7 (S.D.N.Y. Mar. 12, 1998)

("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

Nor has Plaintiff shown that these incidents would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Indeed, Plaintiff testified that Mr. Pollan required everyone in his group to sign in and out. (DS ¶ 119; PR ¶ 119.) It is also undisputed that Mr. Pollan spoke with Andrew Podosenin, another Technological Services Department employee, about taking excessive breaks. (DS ¶ 122.) It is undisputed that Mr. Pollan's allegedly demanding nature was not isolated to Plaintiff—Plaintiff testified that his peers said Mr. Pollan was demanding towards subordinate staff and unreasonable. (DS ¶ 114; PR ¶ 114.) Plaintiff also complains that he was "stripped" of all but one of his projects, but it is undisputed that Plaintiff's other projects were merely placed on hold. (DS ¶ 130.) Moreover, it is undisputed that Plaintiff's supervisors found the quality of his project documentation to be insufficient which led to the reduction in work load. (DS ¶¶ 123, 125-128; PR ¶¶ 123, 125.)

No reasonable juror could find that Plaintiff's complaints rise to the level of a materially adverse action considered separately or as a group. These are merely the minor annoyances of an everyday workplace and not actionable. *See Atkinson*, 453 F. App'x at 266.

**B. Plaintiff's Title VII Hostile Work Environment Claim**

"In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)). A

plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Id.* "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citations and quotation marks omitted).

The majority of Plaintiff's hostile work environment claims are based upon the instances of alleged retaliation discussed above. (Pl.'s Br. at 49.) For the same reasons discussed above, Plaintiff's hostile work environment claims cannot be supported by those actions.

In addition to the alleged retaliation actions, Plaintiff alleges that the treatment he received in Mr. DiFranchi's group created a hostile work environment. (Pl.'s Br. at 48.) Defendant argues that Plaintiff cannot show that Mr. DiFranchi discriminated against him because of his national origin. At his deposition, Plaintiff testified:

> Q: Do you have any evidence at all, hearsay or not, based on conversations with Mr. DiFranchi that he discriminated against you because you were Hispanic?

> A: I would say no.

(Brophy Cert., Exhibit J (Lassalle Dep. Tr. at 105).) The undisputed evidence shows that Mr. DiFranchi treated others similarly to Plaintiff regardless of race or national origin. (*E.g.*, DS ¶¶ 31-33, 40; PR ¶¶ 31-33, 40.) "Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief." *Moore*, 461 F.3d at 342. This is fatal to Plaintiff's Title VII claim.

As noted above, the alleged discrimination must also be "pervasive, regular, or severe." Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). In determining whether an actionable hostile work environment claim exists, a court looks at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. "[O]ffhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (internal citations and quotation marks omitted).

In Mr. DiFranchi's group, the alleged discriminatory conduct occurred over a nine-month period. These acts included being told not to send emails outside of his group without permission, being yelled at during a meeting and having a light turned off on himself and a co-worker, being accused of lying, being asked why he did not send a communication after 7:00 P.M., and being overworked. Many of these complaints fall within normal managerial functions and are not actionable. *See Fichter*, 2013 WL 2501968 at *5 ("As the District Court correctly concluded, many of these claimed hostile actions are well within the scope of common managerial functions. [Plaintiff's] preferences that [her manager] advise her when auditors arrived, remain in the office when she was to report to him, and respect her extra work are not Title VII violations.")

Considering the entire record, including the events in Mr. DiFranchi's group, Mr. Pollan's group, Plaintiff's termination, and Plaintiff's job applications, the Court finds that no reasonable juror could find "facts that demonstrated, by a preponderance of the evidence, that [Plaintiff] is entitled to a verdict" as there has been no showing that these actions were frequent, pervasive, severe or physically threatening. *In re Paoli*, 916 F.2d at 860. Plaintiff's Title VII hostile work environment claim fails for this separate and independent reason. *See*, *e.g.*, *Kimber-Anderson v. City of Newark*, 502 F. App'x 210, 214 (3d Cir. 2012) (affirming summary judgment of no hostile work environment when the claims were based on increased workload, two instances of foul language, and "intense animosity"); *Caver*, 420 F.3d at 262 ("offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim").

## C. Plaintiff's FMLA Claim

Plaintiff argues that he has proven an "interference" claim under the FMLA. Plaintiff does not argue that he has proven a "discrimination" or "retaliation" claim under the FMLA.

To present an "interference" claim under the FMLA, a plaintiff must show "(1) she was entitled to take FMLA leave . . . , and (2) [Defendant] denied her right to do so." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012); *see also Parker v. Hanhemann Univ. Hosp.*, 234 F. Supp. 2d 478, 483 (D.N.J. 2002) ("To present a claim under the FMLA, a plaintiff must show (1) she is an eligible employee under the FMLA, (2) defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to the defendant of her intention to take FMLA leave, and (5) the defendant denied her the benefits to which she was entitled under the FMLA."). But the FMLA does not provide employees with a right against termination for a reason other than interference

with rights under the FMLA. *Lichtenstein*, 691 F.3d at 312. The Port Authority, therefore, can defeat Plaintiff's claim if it can demonstrate that Plaintiff was terminated for reasons unrelated to his alleged exercise of rights under the FMLA. *Id.*; *see also Warwas v. City of Plainfield*, 489 F. App'x 585, 588 (3d Cir. 2012). As explained above, the Port Authority has provided a non-retaliatory and non-discriminatory reason for Plaintiff's suspension and termination, to wit, believing he purchased and installed unauthorized software. As Plaintiff has failed to rebut this reason for termination, his FMLA claim also fails.[17]

### D. Plaintiff's State Law Claims

Plaintiff asserts the following state law causes of action: common law retaliation, breach of an implied covenant of good faith and fair dealing, negligent and intentional infliction of emotional distress, and the Conscientious Employee Protection Act ("CEPA") (N.J.S.A. 34:19-1 *et seq.*). Defendant argues that Plaintiff failed to serve a notice of claim on the Port Authority at least sixty days prior to bringing this suit and, therefore, his recovery based on state law claims is barred by statute. Plaintiff does not address this argument in his brief.

By joint legislative action, the legislatures of New York and New Jersey have waived their sovereign immunity with respect to the Port Authority under certain circumstances. *See* N.J.S.A. § 32:1-157, *et seq.* Under N.J.S.A. 32:1-163, the Port Authority's waiver of sovereign immunity is conditioned on, *inter alia*, the requirement that at least sixty days prior to any suit, the Plaintiff must serve a notice of claim on the Port Authority.[18] This requirement is jurisdictional in nature. *Matthews v. Port of New York Auth.*, 163 N.J. Super. 83, 85 (Ch. Div.

---

[17] Nor is it clear that the alleged notice Plaintiff gave the Port Authority would be sufficient under the statute as it did not contain information that would convey notice of a "serious health condition." *See Phillips v. Quebecor World RAI, Inc.*, 450 F.3d 308, 312 (7th Cir. 2006) ("An employee's reference to being 'sick,' however, does 'not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable.'")

[18] Plaintiff only seeks money damages from the Port Authority.

1978), *aff'd*, 171 N.J. Super. 38 (App. Div. 1979); *see also Campanello v. Port Auth. of New York & New Jersey*, 590 F. Supp. 2d 694, 701 (D.N.J. 2008). As the Plaintiff failed to give notice of these claims at least sixty days prior to filing suit, these claims are dismissed.

Plaintiff's CEPA claim must be dismissed on the separate and independent ground that it is not actionable against the Port Authority as a bi-state entity. *hip Heightened Independence & Progress, Inc. v. Port Auth. of New York & New Jersey*, 693 F.3d 345, 356 (3d Cir. 2012) ("A bi-state entity, created by compact, is 'not subject to the unilateral control of any one of the States that compose the federal system."). "New Jersey [is] barred from applying its civil rights and construction code statutes to the Authority." *Id.*, at 358.

## IV. CONCLUSION

For the reasons stated above, the Court grants the Port Authority's motion for summary judgment. An appropriate order will issue.

**/s/ Faith S. Hochberg**
**Hon. Faith S. Hochberg, U.S.D.J.**